37 C.C.P.A. (Patents)

### Application of BOWDEN et al.
### Patent Appeal No. 5716.

United States Court of Customs and Patent Appeals.

Argued May 12, 1950.

Decided June 30, 1950.

Louis H. Baer, New York City, for appellants.

E. L. Reynolds, Washington, D. C. (J. Schimmel, Washington, D. C., of counsel), for the Commissioner of Patents.

Before GARRETT, Chief Judge, and JACKSON, O'CONNELL, JOHNSON, and WORLEY, Associate Judges.

O'CONNELL, Judge.

This is an appeal from not only the original decision of the Board of Appeals of the United States Patent Office affirming that of the Primary Examiner in his rejection of all of the claims, 12–19 and 22, in appellants' application for a patent on insecticidal coating compositions but also from the decision of the same tribunal continuing the disallowance of the claims following appellants' petition for reconsideration. Claim 19 was rejected as not reading on the elected species of coating composition and, therefore, need not be considered on the merits.

The composition claimed is a new oil paint or varnish, containing a small amount of DDT, which upon application to a suitable surface, and after a suitable drying period, manifests a high degree of insecticidal activity over subsequent months, substantially abolishes the prevalence of flies and other insects, and thereby diminishes the spread of diseases.

The claims were rejected as unpatentable over the following prior art relied upon by both the examiner and the board:

| | | | |
|---|---|---|---|
| Calcott et al. | 1,958,418 | May | 15, 1934 |
| Patterson et al. | 2,097,339 | Oct. | 26, 1937 |
| Geigy (Br.) | 547,874 | Sept. | 15, 1942 |
| Muller | 2,329,074 | Sept. | 7, 1943 |

The following references "of interest" were cited also by the tribunals of the Patent Office:

Anderson 2,346,409 Apr. 11, 1944, "Persistence of DDT in Oil-Bound Water Paint," Nature, Oct. 21, 1944, pp. 512, 513,

Carrick, "The Use of DDT in Paint," Paint, Oil and Chemical Review, Nov. 1, 1945, pp. 104, 105,

Gilmour, "The Toxicity to Houseflies of Paints containing DDT,"—Journal of the Council for Industrial Research, August 1946, pp. 225–232.

Two publications were added to the list of references and incorporated in the record by request of appellants in their petition for reconsideration. One such reference was to a report published in Paint Technology in December of 1944, at pages 261–264. The other was to a report on *The State of the Art* published at page 2 of the Aminco Laboratory News of March of 1945.

A composition of matter is defined by the appealed claims, the respective limitations of which make some of the claims more specific than others. It is deemed however that all of the claims stand or fall together and that claim 12 is illustrative of the subject matter upon which appellants rely to define invention. Claim 12 reads:

"12. An insecticidal substantially water-immiscible, coating composition comprising a coating composition substantially immiscible with water and containing a substantial portion of an unsaturated, fatty drying-oil constitutent as the major film-forming agent, a proportion, effective as an insecticide of 2, 2-bis (p–chlorophenyl) 1, 1, 1–trichloroethane, and an organic volatile solvent for said 2, 2-bis (p–chlorophenyl), 1, 1, 1–trichloroethane, the amount and the volatility of said solvent being such as to cause migration of said 2, 2–bis (p–chlorophenyl) 1, 1, 1–trichloroethane to the exterior of the coating film after an initial film has been formed."

Appellants in their brief allege that:

"The essence of the invention is in the concept and discovery that to have effective insecticidal action and drive the DDT through pigment particles and hardened film of unsaturated fatty drying oil, there must be a *sufficient amount* of a *volatile* solvent to do the work.

\* \* \* \* \* \*

"The appellants found that preferably from 10–30% by weight [as defined in their specification], but as much as *10 to about 40% by weight,* as calculated from the Examples [set forth in their application], of a volatile organic solvent was necessary to carry enough DDT to the surface to effectively obtain at least a 50% kill which is considered by the art, to be the minimum effectiveness." (Italics quoted).

The composition defined by claim 12 contains three essential ingredients: (1) an unsaturated, fatty drying oil constituent as the major film-forming agent; (2) a proportion, effective as an insecticide, DDT; and (3) an organic volatile solvent of an amount of volatility sufficient to cause the DDT to migrate to the exterior film surface of the coating where it is deposited in the form of crystals after the initial coating film has been formed.

In the following discussion, 2, 2 bis (p-chlorophenyl) 1, 1, 1– trichloroethane, a toxic poison, will be identified as DDT. References disclosing joint inventors will be identified without repetition of the term et al.

The basic references are the patents to Calcott and Patterson, each of which was assigned to E. I. duPont de Nemours & Company. Neither reference discloses the use of DDT.

The patent to Calcott discloses coating compositions, for example, paints and varnishes, used as resistant or toxicant materials to prevent marine growths on ship bottoms. The toxic is soluble in the film-forming agent. The essential ingredients in-

corporated in the coating are (1) a synthetic drying oil, which is particularly suitable for the preparation of the paint, or film-forming agent; and (2) a toxic substance soluble in the film-forming agent and employed in a quantity exceeding its solubility in the film-forming agent, so that the toxic substance tends to "bloom out" on the surface of the film or coating.

The patent to Calcott suggests, but does not require, the use of a solvent and the specification states that the toxic may be added to previously prepared paints, varnishes, and coating compositions. In the event of the use of a solvent to cause the toxic to "bloom out," the use of about 20% by weight of xylene is disclosed in the cited example.

The patent to Patterson, like the patent to Calcott, discloses the use of toxic materials in paints of various types. The patent is directed particularly to coating compositions or paints, resistant to fungus and containing a mold preventative for use on houses and barns and on the shutters or the trim of houses and barns. The mold inhibitor comprises certain organic mercurials, and phenyl mercurials. The compound is often ground in part of the thinner used in making the paint. The compound may be added also as a powder or in the form of a solution. A percentage of solvent is disclosed which falls within the range claimed by appellants in claims 13 and 14. Patterson does not mention that the amount of the solvent is critical or that it is essential as a vehicle for carrying the toxic to the surface.

The patent to Muller was assigned to Geigy, owner of the British patent to Geigy, hereinafter described. Muller discloses a composition containing DDT as its essential ingredient. The composition is used either in the powdered state or in a sprayed solution for combating insects of all kinds such as flies, beetles, moths, and plant lice.

The British patent to Geigy relates to solid insecticidal compositions or powdery compositions containing DDT. The solids are inorganic porous materials and the DDT may be applied in powdered form or dissolved in a solution.

The appealed claims, 12–18 and 22, were finally rejected as lacking invention over Calcott or Patterson in view of either Muller or the British patent to Geigy. The Patent Office took the position that the substitution of DDT, disclosed by Muller and by Geigy, for Calcott's toxic would meet the claims, since Calcott disclosed that, by calculation, about 20% by weight of xylene as a solvent was used in combination with the toxic, the silica extender and the synthetic drying oil.

The rejection on Patterson, in view of the two subsidiary references, was based on the disclosure of an amount of solvent as claimed in claims 13 and 14. Substituting DDT for the mold inhibitor of Patterson, according to tribunals of the Patent Office, would not involve invention.

The Solicitor for the Patent Office bases his position here on the proposition that: " * * * Utilizing the newer insecticides as they become available in place of the older ones does not constitute invention. * * * And even though appellants have achieved a desirable result, such achievement is not invention, since, the substitution being obvious, the results that flow from such obvious adaption of materials plainly foreshadowed by the teachings of the prior art, requiring only routine trial and error experimentation. * * *"

Appellants do not dispute that paints and varnishes are disclosed whose solvent content falls within appellants' 10–40% by weight range. Nor do they deny that among painters it is common practice to reduce the viscosity and increase the fluidity of paint to permit its easy application, and that it is old in the art to add a toxic material to thinned paints to form an insecticide.

Appellants point out, however, and there is no dispute about it, that they were the first ever to produce a successful DDT coating composition of the oil type. The real point in issue, therefore, is whether their contribution to the art in substituting DDT for the toxic content disclosed by the basic references was inventive or merely a procedure obvious to anyone skilled in the art.

Judge Learned Hand once stated that "it is the obvious when discovered and put to use that most often proves invention. In

such matters we look rather to history than to our own powers of divination, if history is at hand." H. C. White Co. v. Morton E. Converse & Son Co., 2 Cir., 20 F. 2d 311, 313. Divination, as Judge Hand explained, means the duty of divining performed by the courts in reaching a conclusion as to whether a new display of ingenuity is an invention beyond the compass of the routineer. It involves the obligation imposed upon the courts of appraising, as best they can, and with such good sense as they may have, not only the day to day capacity of the ordinary person skilled in the art, but also the history and underlying state of the art at about the time of the alleged invention, the occasion for it, and the success it has attained. Kirsch Mfg. Co. v. Gould Mersereau Co., Inc., 2 Cir., 6 F.2d 793, 794. There the court reached the final conclusion that: "There comes a point when the question must be resolved by a subjective opinion as to what seems an easy step and what does not. We must try to correct our standard by such objective references as we can, but in the end the judgment will appear, and no doubt be, to a large extent personal, and in that sense arbitrary."

In the case at bar, appellants have produced not one but a number of published statements by workers and experts skilled in the art which proved that prior to the time the appellants filed their application on February 5, 1945, and for some time thereafter, the art considered DDT in a film-forming paint would be ineffective. Listed in chronological order, is (1) an article published in Nature Magazine of October of 1944 by G. A. Campbell, of the Geigy Colour Co. Ltd. and T. F. West, which reads: " * * * in the more durable coatings such as oil paints and synthetic varnish paints, one might expect the D.D.T. particles to be prevented from exercising their insecticidal effect because of the strongly absorbed oil film. These expectations were, in fact, confirmed by our results * * *."

In December of 1944, a report (2) was made in the journal Paint Technology of a document read before a general meeting of the Oil and Colour Chemists' Association by G. A. Campbell, M.Sc., and T. F. West, Ph.D., F.R.I.C., which, among other things, stated: " * * * Zinc mesh fly cages were lined with pieces of plywood cut to fit, and these were coated with * * * white lead oil paint and synthetic varnish enamel, each containing 5 percent of DDT which was incorporated by straight grinding * * *. The oil paint and the synthetic enamel containing DDT did not prove insecticidal to flies at all, probably owing to the oil forming a completely protective layer round the DDT * * *."

In the Aminco Laboratory News of March of 1945, supra, the following statement (3) appears: "Harder finishes, like ordinary oil paints and synthetic varnishes, have thus far not proven successful as carriers of DDT, the negative result being ascribed to the tighter adsorption of the oil film; however, experiments with these types of coatings are being continued."

On October 31, 1945, in the Paint, Oil and Chemical Review, supra, L. L. Carrick, professor of chemical engineering, at the University of Michigan, and consultant of the scientific section of the National Paint, Varnish and Lacquer Association, Inc. gave a review (4) of the literature on DDT which, among other things, stated: "The effectiveness of DDT in semi-gloss and gloss oil paints and synthetic enamels remains to be demonstrated. It is presumed, in the absence of more definite information, that the microscopic particles of DDT are completely coated with an adsorbed oil or resin film, and hence are effectively insulated so that direct contract with crawling insects is for all insecticidal purposes prevented. * * *"

The actual failures by men skilled in the art to produce a composition such as is defined by the appealed claims indicates that what appellants have done would not be an obvious expedient and that appellants are therefore entitled to the allowance of such claims. This is particularly true in the case at bar since the two reference patents disclosing the use of DDT as a toxic ingredient in a coating composition were both owned by the Geigy organization whose representative made the report, supra, that

in doing what appellants had done, the DDT particles would be prevented from effecting their insecticidal effect.

There has been a great amount of discussion in the decisions of the tribunals of the Patent Office and in the brief of the solicitor relative to the fact that appellants assumed, up to the time of filing their presently involved application, that synthetic drying oils would be equally effective with the fatty drying oils in effecting the desired result and that the application so states.

Appellants, however, upon the discovery of that misstatement, properly corrected their specification. Under the law a patent will be issued to an inventor although he may not understand the principle upon which his invention works. In re Parlanti et al., 158 F.2d 1018, 34 C.C.P.A., Patents, 803. Moreover, since chemical reactions frequently are unpredictable, a specification may be amended at the proper time to supply corrected data subsequently discovered.

Numerous other points have been vigorously and ably argued not only in the respective decisions of the tribunals of the Patent Office but also in the briefs of the Solicitor for the Patent Office and counsel for appellants. However, in view of the conclusion hereinbefore expressed, it is deemed unnecessary to discuss those matters, and the decision of the Board of Appeals with respect to the appealed claims is reversed.

Reversed.