53 CCPA
**Application of John BULINA (Deceased) and Jack T. Brown.
Patent Appeal No. 7559.**

United States Court of Customs and Patent Appeals.
June 23, 1966.

H. M. Snyder, Los Angeles, Cal., for appellants.

Clarence W. Moore, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before RICH, Acting Chief Judge, and MARTIN, SMITH and ALMOND, Judges, and Judge WILLIAM H. KIRKPATRICK.[*]

SMITH, Judge.

The invention here involved is claimed in appealed claims [1] 2, 6 and 7 as a process, in appealed claims 1, 3, 4 and 9 as an alloy, in claims 5 and 11 as a "member" and in claim 12 as a turbine blade. One claim stands allowed.

At the outset there appears to be a substantial question as to the ground or grounds of the rejection on appeal which creates a considerable doubt as to wheth-

[*] United States Senior District Judge for the Eastern District of Pennsylvania, designated to participate in place of Chief Judge WORLEY, pursuant to provisions of Section 294(d), Title 28, United States Code.

[1] Presented in application Ser. No. 846,906, filed Oct. 16, 1959, for "Damping Alloys and Members Prepared Therefrom."

er the rejection has been so stated as to comply with 35 U.S.C. § 132.

This question can be best evaluated against the technical background of the invention in issue. In general, the invention relates to a process for making improved heat-treated alloy members having high damping capacity at elevated temperatures under stress, and to members made in accordance with the process. The process is asserted to be applicable to a broad range of alloys containing nickel and at least one of the elements chromium, iron, and cobalt; the total of the named elements being at least 80% by weight of the alloy. The asserted improvement is the presence in the heat-treated alloy of a particular microstructure, i. e., lamellar colonies forming a cellular precipitate wherein the lamellar colonies constitute at least 3% of any cross section of the alloy. The cellular precipitate is a microstructure previously known and readily recognized by metallurgists. The heat-treated alloy, when employed as a machine element at elevated temperatures, is asserted to suppress vibration, commonly described as a "damping" alloy.

All of the presently appealed claims, as well as claim 8 on which the examiner's rejection was reversed by the Board of Appeals, appear to have been finally rejected "over the references of record for the reasons of record adequately set forth in Paper No. 6." In Paper No. 6 the claims were all rejected on the following grounds:

Claims 1 to 7, 11 and 12 are rejected as unpatentable over the ASM publication, page 103, in view of Cochardt and the ASM publication, pages 454 to 490 and 439 to 447. The ASM publication on page 103 shows how aging and overaging increases the damping capacities of an age hardenable alloy. The Cochardt patent discloses a composition of an alloy which is age hardenable and meets the applicants' composition. The ASM publication on pages 454 to 490 and 439 to 447 teaches that aged and overaged alloys of nickel and cobalt form precipitates in a cellular structure. The latter references to the ASM publication also give applicable solution and aging temperatures which fall within the applicants' ranges. It would not be patentable invention to solution treat and age the alloys of Cochardt by the methods disclosed in the ASM publication to obtain better damping capacities because the ASM publication on page 103 shows that aging can increase the logarithmic decrement.

\* \* \* \* \* \*

Claims 1, 8 and 9 are rejected as unpatentable over Pilling in view of pages 103 and 279 to 287 of ASM publication and for the above stated reasons. The Pilling patent discloses alloys within the ranges of the applicants' alloys. The ASM publication on pages 279 to 287 teaches the applicable heat treating methods for alloys within the range of Pilling's alloy. It would not be patentable invention to combine the teachings of Pilling and the ASM publication to achieve a ferrous alloy with high damping capacity because the effects of age hardening on the damping capacity are shown on page 103 of the ASM publication which shows no new and unobvious results would be realized by such a combination.

The references referred to above by the examiner were:

Pilling et al. 2,048,163 July 21, 1936 [Pilling]

Cochardt et al. 2,829,048 Apr. 1, 1958 [Cochardt]

ASM, "Educational Lectures on Precipitation from Solid Solution," 103, 279–287, 439–447, 454–490 (1959). [ASM]

The history of the prosecution of this application up to and including the examiner's "paper No. 6" is difficult to follow because of what appears to be constantly changing grounds of rejection. It may well be an over-simplification to say that taken in its entirety the examiner's position seems to us to have been,

"It would not be patentable invention" to do what is claimed in view of a combination of references. As to claims 1, 8 and 9, we find in addition, however, the examiner stating "no new and unobvious result would be realized."

It seems to us, therefore, that the issue joined before the examiner necessarily arises under 35 U.S.C. § 103. The board eliminated the ASM reference,[2] reversed the examiner as to his rejection of claim 8, sustained the rejection of claims 1 to 7 and 11 and 12 on Cochardt alone, and sustained the rejection of claims 1 and 9 on Pilling alone. While certain portions of the board's opinion suggest a rejection based on 35 U.S.C. § 102, we think when treated as a whole the rejection was sustained as a rejection for obviousness under section 103. We shall resolve the issue on this basis.

The Supreme Court has suggested that certain guide lines be employed in dealing with such a rejection. In Graham v. John Deere Co., 383 U.S. 1, 17, 86 S.Ct. 684, 694, 15 L.Ed.2d 545 (1966), the court observed:

> * * * the § 103 condition, which is but one of three conditions, each of which must be satisfied, lends itself to several basic factual inquiries. Under § 103, the scope and content of the prior art are to be determined; differences between the prior art and the claims at issue are to be ascertained; and the level of ordinary skill in the pertinent art resolved. Against this background, the obviousness or nonobviousness of the subject matter is determined. Such secondary considerations as commercial success, long felt but unsolved needs, failure of others, etc., might be utilized to give light to the circumstances surrounding the origin of the subject matter sought to be patented. As indicia of obviousness or nonobviousness, these inquiries may have relevancy. * * *

The relevance of this observation is demonstrated in the present appeal. The factual issue to be resolved as to the patentability of claims 1 to 7 and 11 and 12 in view of Cochardt first requires an understanding of the Cochardt teachings. The examiner stated his position as to what Cochardt disclosed and appellants filed Cochardt's own affidavit which contradicted this position. The board in considering this affidavit said:

> * * * As indicated in the Cochardt affidavit, a sufficiently long period of aging is responsible for the appearance of the cellular precipitate. In contradiction to the affidavit we do not see how Cochardt et al. could avoid having lengthy aging periods and cellular precipates when his alloys were used for their intended purpose, as turbine blades with steam having a temperature of 1200°F. Again we observe that Cochardt et al. recognize this possibility of aging during actual use.

So far as we have been able to ascertain, this is the first instance in the present record in which the rejection on Cochardt was predicated upon the factual assumption that turbine blades could be aged to form cellular precipitates by operation of the blades in a steam turbine supplied with steam having a temperature of 1200°F.

Appellants filed a petition for reconsideration in which this factual assumption of the board was challenged and also filed an affidavit of Joseph D. Conrad, Sr. [hereafter Conrad], in which he stated *inter alia*:

> * * * it may not be assumed that satisfactory aging of the turbine blades can be secured after the blades are installed in the turbine and while the turbine is operated in service. The steam temperatures on the turbine blades vary radically between no load or very low load conditions and at substantial load conditions. When a

---

2. There is a substantial and prolonged argument between appellants and the examiner as to the availability of the teach-ings of the ASM reference, which because of the board's action, need not be resolved.

turbine is operated under a load the steam temperatures drop radically at each row of blades since energy is transferred from the steam to the turbine.

That, it is erroneous to assume that the steam impinging on the turbine blades is at the rated maximum steam temperature of the turbine; whereas, in fact, the steam at a nominal inlet temperature of say 1200°F, drops in temperature in passing through the nozzle so that even under full load, the temperature of the steam at the first row of blades is no more than 1130°F;

That, even under full load, at the second stage of blading the temperature of the steam impinging thereon is less than 1100°F and at the third stage of blading the steam temperature is about 1050°F, and becomes progressively lower for each subsequent row of blades, and, the 1200°F aging of the alloy cannot occur in the turbine blades during normal operation of the turbine * * *.

He then concluded that:

* * * aging turbine blades in normal operation under load, of the alloys of the patent to Cochardt et al, will not result in the production of a cellular precipitate, and that if an attempt were made to rely upon this aging procedure for blades without the cellular precipitate in the metal, it might well result in severely damaging the turbine.

The board, citing the decision in In re Martin, 154 F.2d 126, 33 CCPA 842, as authority for its position, refused to consider the Conrad affidavit stating:

* * * it is not the practice of this Board to consider affidavits filed with a request for reconsideration of our decision. At the most, they will be treated only as arguments.

It is noted that the *Martin* decision was rendered in 1946, prior to the enactment of section 103. It seems clear to us that whatever may have been the merit in 1946 of the solicitor's position as to the affidavit in the *Martin* case, it is not controlling here for two reasons:

1. The rejection concerning which the Conrad affidavit was here filed is predicated upon *factual assumptions* first made in the board opinion, and

2. In arriving at the legal conclusion required by section 103 we must consider the *factual* basis supporting the ultimate legal conclusion. Cf. Graham v. John Deere Co., supra.

■ To support a finding of obviousness under section 103 it is essential that it be based on a sound factual basis. We have reviewed the Conrad affidavit which the board refused to consider and find it persuasive indeed that the *assumptions* or *inferences* of scientific fact which the board found in the Cochardt reference are not supportable.

■ As a steam turbine engineer, Conrad averred facts as to the steam temperature in turbines operating at nominal steam inlet temperature of 1200°F. He pointed out that substantial drops in temperature occur as the steam passes through nozzles so that even at the first stage of blades the temperature of the steam is no more than 1130°F. and that the steam temperature at succeeding blade stages is less than 1100°F. Conrad further stated that, to his knowledge, only one steam turbine in the United States has been put into operation using 1200°F. steam and, in any case, high damping alloys of the type disclosed in the Cochardt patent and in the present application have been employed only in steam turbines having nominal steam temperatures of 1050°F. and 1000°F. The board's refusal to consider the affidavit of Conrad under the circumstances of this case was erroneous. It should have carefully considered the affidavit since the introduction of the affidavit was occasioned by what appears to be

the board's extrapolation of unsupported facts from the teachings of Cochardt.

As appellants state in their brief:

It should be noted that the first effort to produce the cellular precipitate in the cobalt-nickel base alloy required a period of treatment of 2500 hours at 1200°F., or more than 100 *days*. Cochardt et al suggest a period of about 100 *hours* of aging at 1200°F., for it is Cochardt's observation that prolonged aging does not substantially increase the hardness of the alloy and, consequently, all benefit that can be conferred by the aging treatment has been obtained. The Board, with appellants' disclosure before it, is aware that Cochardt et al were wrong in their conclusion, for appellants have taught the Board that prolonged aging will yield lamellar colonies forming a cellular precipitate, a microstructure which raises the damping capacity of the alloy far above that achieved by Cochardt et al.

In In re McKenna, 203 F.2d 717, 40 CCPA 937, this court stated:

* * * the courts should resort not only to an attempt to determine whether an applicant's novel feature is within the capacity of a skilled mechanic in the art, but also to the history and underlying state of the art at or about the time of the alleged invention, the occasion for it, the advantages and successes it achieves. In re Worrest, 201 F.2d 930, 40 C.C.P.A. Patents, 804; In re Bowden, [et al], 183 F.2d 115, 37 C.C.P.A., Patents, 1201; In re Holt, 162 F.2d 472, 34 C.C.P.A., Patents, 1129. Of course the record as to the history of the art before the Patent Office tribunals and this court in an *ex parte* case would almost invariably be less complete, and perhaps less reliable, than that before a court in an *inter partes* infringement suit, due to obvious inherent differences in the nature of the two proceedings; and this is a factor to be considered by us in applying the ' "history of the art" test.' In re Worrest, supra [201 F.2d 933].

Although there are certain obvious shortcomings in *ex parte* affidavits as proof, it seems to us that such affidavits are clearly one of the few practical methods of presenting a factual record sufficient to form a basis for proper application of the "history of the art test" in this type of *ex parte* proceeding. Indeed, in some cases this court has reversed the Patent Office, relying considerably on affidavits presenting facts which convinced us that the invention of the application had some meritorious advantage over the prior art. In re Burgess, Jr., 167 F.2d 637, 35 C.C.P.A., Patents, 1076; In re Holt, supra. Such *ex parte* affidavits must, of course, be closely scrutinized and weighed with care, it being kept in mind that they may unconsciously and unintentionally be colored as a result of enthusiasm for the subject matter of the application. We think also that an affidavit by an applicant or co-applicant as to the advantages of his invention is less persuasive than one made by a disinterested person. See Ex Parte Coleman, 29 USPQ 378, Bd. of Appeals. However, it is not to be disregarded for that reason alone and may be relied on when sufficiently convincing. See In re Holt, supra, and In re Mock, 117 F.2d 745, 28 C.C.P.A., Patents, 919, wherein this court relied on such affidavits in reversing the Board of Appeals.

■ Applying these observations to both the Conrad and Cochardt[3] affi-

---

3. We find appellants' position persuasive as stated in their brief:

The affidavit of Cochardt indicates how far the Board of Appeals has gone astray in relying on the Cochardt et al reference as an anticipation for a high damping alloy member containing a substantial proportion of cellular precipi-tate. Appellants filed the Cochardt et al affidavit (R. pp. 138 to 141) in order to establish the unobviousness and the merits of the present invention over the prior art, in particular, the Cochardt et al patent.

As a metallurgist and co-inventor of the Cochardt et al reference patent.

davits, we disagree with the decision of the board and it is reversed as to claims 1 to 7 and 11 and 12.

The board affirmed the rejection of claims 1 and 9 on Pilling alone. The essence of the position of the board as to Pilling appears to be that it would be inherent from the Pilling disclosure to obtain alloys having at least 3% lamellar colonies. A study of the Pilling patent shows that it fails to teach or disclose any lamellar colonies or cellular precipitate whatsoever in the alloys mentioned. It seems improbable that, even through accident, any heat treatment disclosed therein would produce cellular precipitate in the required amounts. It seems to us the board here engages in speculation and except for appellants' own teachings we find no facts of record supporting this rejection.

The Pilling patent suggests that boron may be present in the disclosed alloys in amounts of up to ½%. Appellants disclosed that boron inhibits the formation of cellular precipitate. Thus the alloys of Pilling may have boron in sufficient amounts actually to *suppress* the formation of cellular precipitate.

Considered in the light most favorable to the board's position, the disclosures in the Cochardt and Pilling references of an alloy with damping properties due to their lamellar structures would at best be accidental or unintended. If section 103 is to be applied as the Supreme Court suggests it should be in *Graham, Calmar, Colgate-Palmolive* [4] and *Adams* [5] cases, there is more reason than ever to apply the statement in Tilghman v. Proctor, 102 U.S. 707, 711–712, 26 L.Ed. 279 (1880) to such a situation. There, the Supreme Court in considering whether the prior art anticipated a process patent for separating glycerin from fat acids, said:

If the acids (in the prior art) were accidentally and unwittingly produced, whilst the operators were in pursuit of other and different results, without exciting attention and without its even being known what was done or how it had been done, it would be absurd to say that this was an anticipation of Tilghman's discovery.

We will next consider the board's criticism of claim 9. The board stated:

Assuming that there is in fact a structural distinction over the alloys of Pilling et al., it is thought to be defined with insufficient particularity to amount to a patentable distinction, In re Fields, 50 CCPA [709], 1962 C.D. 461, 784 O.G. 8, 304 F.(2d) 691, 134 USPQ 242. On page 3 of the specification the lamellar colonies are

Cochardt stated that he carried out an extensive metallurgical investigation for the purpose of developing alloys having improved damping properties, and that he particularly studied cobalt-base precipitation hardening alloys containing substantial amounts of nickel therein. Cochardt averred that he had supervised the melting, solution treatment and aging of numerous heats of cobalt-base precipitation hardening alloys and produced, studied and tested many specimens to determine physical properties including damping properties and that some of the alloys had composition similar to those disclosed in this patent application. Cochardt further stated that in the production of alloys in accordance with the patent to Cochardt et al, excellent damping properties were obtained with the specific cobalt-base alloy composition set forth therein and many of these cobalt-base alloys were produced and when examined metallographically showed no cellular precipitate and when tested exhibited good damping properties.

Cochardt states that the aging treatments set forth in the Cochardt et al patent were not intended to produce a lamellar or cellular precipitate in the alloys treated and that though he and his co-inventor had observed on occasion a cellular precipitate in a few cobalt-base alloy members which had been overaged, they believed, for reasons of strength and ductility, such lamellar precipitate was not desirable.

Clearly, the * * * advance which the Board would attribute to Cochardt et al, was not within the contemplation of the inventors.

4. See text, supra.

5. United States v. Adams, 383 U.S. 39, 86 S.Ct. 708, 15 L.Ed.2d 572 (1966).

described as "areas of relatively depleted matrix continuous with itself and the alloy matrix proper, and spaced strips of precipitate disposed in the depleted matrix." It is not seen how good damping properties can be attributed to the presence of "lamellar colonies" without any further characterization of them.

From a review of the specification we find the lamellar colonies are clearly described in the specification and illustrated in the drawings. It is pointed out in the specification that metallurgists are familiar with the structure. The data relating to damping characteristics presented in the application show the superior damping properties obtained when the lamellar colonies are present. Thus, it seems to us the board's objection is without support. The term "lamellar colonies" as used in claim 9 is clearly defined in the specification so that one skilled in the art can recognize and identify this critical structure, and can practice the claimed invention and thereby obtain the damping properties described. This fulfills the requirement stated in the first sentence of the second paragraph of 35 U.S.C. § 112 which provides:

> The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

Reading this requirement in the light of par. 1 of section 112, we think the criticism of the board is unwarranted.

Appellants summarized as the "primary object of their invention" what the affidavits establish factually as being an unobvious contribution to this highly developed and highly technical art. As stated in the specification this object is:

> * * * to provide an alloy having high damping characteristics, the alloy comprising essentially predetermined critical amounts of nickel and at least one element selected from the group consisting of chromium, iron, and cobalt, and hardening constituents, the alloy structurally comprising a matrix with a substantial proportion of lamellar colonies distributed therein.

We fail to find on the present record that such a basic concept was made obvious in this art until appellants stated it, described it and claimed it. Reading the prior art as we must without the benefit of appellants' teachings, it is clear that appellants' contribution was not obvious within the meaning of section 103.

For the foregoing reasons, the decision of the board is reversed.

Reversed.

MARTIN, J., concurs in the result.